UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES V. LANG,

               Plaintiff,                               Civil Action No. 11-cv-12271

       v.                                      District Judge Arthur J. Tarnow
                                           Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION TO**
**REMAND THE COMMISSIONER'S DISABILITY DETERMINATION**

      Plaintiff James Lang brings this action pursuant to 42 U.S.C. § 405(g) challenging the final decision of Defendant Commissioner of Social Security denying his application for Disability Insurance Benefits under the Social Security Act. Both parties filed summary judgment motions (Dkts. 10, 13), which are presently before this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) (Dkt. 2).

**I. RECOMMENDATION**

      For the reasons set forth below, this Court finds that the Administrative Law Judge did not comply with the procedural aspects of the treating-source rule in rejecting the opinions of Plaintiff's long-time primary-care physician. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## II.  REPORT

### A.  Procedural History

On January 23, 2007, Plaintiff filed an application for Disability Insurance Benefits asserting that he became unable to work on September 16, 2005.  (Tr. 16.)  The Commissioner of Social Security ("Commissioner") initially denied Plaintiff's disability application on April 25, 2007. (Tr. 16.)  Plaintiff then filed a request for an administrative hearing, and on July 21, 2009, he appeared with counsel before Administrative Law Judge ("ALJ") Lawrence E. Blatnik, who considered the case *de novo*.  (*See* Tr. 16-25; 29-63.)  In a November 3, 2009 decision, the ALJ found that Plaintiff was not disabled.  (Tr. 16-25.)  The ALJ's decision became the final decision of the Commissioner on March 25, 2011 when the Appeals Council denied Plaintiff's request for review.  (Tr. 1.)  Plaintiff filed this suit on May 24, 2011.  (Dkt. 1.)

### B.  Background

Plaintiff was 60 years old on the alleged disability onset date.  He holds a B.S. in biology and worked for many years as a chemist in research and development.  (Tr. 32, 35-37.)

#### 1.  Plaintiff's Testimony Before the ALJ

Plaintiff testified that he retired in September 2005 for two reasons: his company was "trying to get rid of their senior workers" and he "had a problem with [his] arms hurting."  (Tr. 38.)  When asked if he could have continued to work, Plaintiff said he was "unsure" because his job required writing, and "I can't write."  (Tr. 39.)  Plaintiff testified that the cause of his left, dominant arm trouble was tendinitis.  (*Id.*)  Although he stated that his arm had improved in the years since his retirement, he also said that "on occasion it does get tender" and "two or three weeks ago" it hurt to write.  (*Id.*)  He provided that making a twisting motion with his left arm could cause it to "pop"

2

which caused pain.  (Tr. 59.)

Plaintiff also explained that he has right shoulder pain.  (Tr. 44.)  Plaintiff thought he could carry up to two gallons with that arm if he kept it down but could not raise his arm with that weight. (Tr. 44.)  Plaintiff said he experiences pain once he raises his right arm above a 45 degree angle; for example, if his right arm is atop a steering wheel.  (Tr. 44-45.)  He testified, however, that he does not normally have problems opening a jar, turning a door knob, or doing "fine" work like using a keyboard.  (Tr. 45.)

Plaintiff also testified to other medical conditions.  He noted heart problems, including having stents placed in his arteries in the past.  (Tr. 41.)  Plaintiff also explained that he is diabetic and has high cholesterol and high blood pressure.  (Tr. 42.)  Plaintiff said that he occasionally gets dizzy upon standing and experiences shortness of breath after climbing stairs.  (Tr. 40-41.)  He agreed with the ALJ, however, that once on his feet, he is "usually . . . fine."  (Tr. 44.)

In terms of daily activities, Plaintiff said he was able to do household cleaning (but suggested that he did not do those chores very well).  (Tr. 46.)  Plaintiff also stated he could do his laundry, go grocery shopping, and mow his lawn using a riding mower.  (Tr. 46-47.)  On a self-completed function report, Plaintiff indicated that three times a week he would have "coffee with retired seniors" and/or go to the library.  (Tr. 138, 142.)  The function report also provides that Plaintiff could walk 1000 feet before needing a ten-minute rest.  (Tr. 143.)

        2.  *Medical Evidence*

Plaintiff's primary-care physician was an internal medicine practitioner, Dr. Shannon Browne.  The first medical record from Dr. Browne in the administrative record is from May 2006 and relates to Plaintiff's request to have prescriptions filled or renewed.  (Tr. 204.)  Dr. Browne

3

noted "[c]annot fill[;] [patient] has not been . . . here in over [two] years." (*Id.*) Dr. Browne then saw Plaintiff on June 5, 2006. (Tr. 204.) Although Dr. Browne's notes from this appointment are mostly illegible, he apparently noted Plaintiff's diabetes and that Plaintiff had not seen an endocrinologist in two years. (Tr. 204.)

In June and July 2006, Plaintiff underwent diagnostic testing ordered by Dr. Browne. (Tr. 205-11.) Laboratory work indicated that Plaintiff's hemoglobin A1C was 7.2. (Tr. 209.)[1] Chest x-rays returned normal and showed no significant change from a prior study done in 2003. (Tr. 206-07.) The results of a July 2006 exercise stress test appear to be mixed. (Tr. 227.)

Plaintiff returned to Dr. Browne in January 2007. (Tr. 215.) Dr. Browne discussed the possibility of starting Plaintiff on insulin because his December 2006 hemoglobin A1C testing showed 8.9 percent. (Tr. 214, 215.) Plaintiff, however, was "hesitant" to proceed. (Tr. 215.) Dr. Browne referred Plaintiff to an endocrinologist. (*Id.*)

The next month, Dr. Browne noted, "[I have] received a letter from [the patient's law firm] regarding disability paperwork. I am not sure what symptoms patient is having limiting his work ability. Recommend [office visit] for interview regarding this paperwork." (Tr. 215.)

The office visit took place on March 13, 2007; Dr. Browne noted that Plaintiff was "here for [a] disability letter." (Tr. 171.) Plaintiff reported shortness of breath during activity and that he was unable to shovel snow or mow the lawn. (Tr. 171.) He also reported some lightheadedness at standing. (*Id.*) On the completed disability form, Dr. Browne diagnosed Plaintiff with coronary

---

[1]"For someone who doesn't have diabetes, a normal A1C level can range from 4.5 to 6 percent. Someone who's had uncontrolled diabetes for a long time might have an A1C level above 9 percent." Mayo Clinic Staff, *A1C Test: Basics: Results* (Jan. 21, 2011) *available at* http://www.mayoclinic.com/health/a1c-test/MY00142/DSECTION=results.

4

artery disease status-post myocardial infarction (heart attack) with stenting in 1998, poorly controlled diabetes mellitus, and left knee surgeries in 1970 and 1998 limiting Plaintiff's ability to stand and walk.  (Tr. 172.)[2]  On the portion of the form for supporting laboratory or diagnostic testing, Dr. Browne provided "HgA1C 8.9" and noted that Plaintiff's diabetes was poorly controlled.  (Tr. 173; *see also* Tr. 214.)  He listed seven medications Plaintiff was taking and noted that Plaintiff's "erratic blood sugars may affect [his] ability to work."  (Tr. 174.)  He provided that Plaintiff could sit and stand for two hours each in an eight-hour day, and that Plaintiff could occasionally lift and carry up to 10 pounds but not more, and that Plaintiff was incapable of handling even "low" work stress.  (Tr. 175.)

On March 29, 2007, Dr. Mary Wood examined Plaintiff on behalf of the State Disability Determination Service ("DDS").  (Tr. 178-82.)  Plaintiff reported having diabetes and hypertension but indicated that they were well controlled with medication.  (Tr. 178.)  He told Dr. Wood that he experiences shortness of breath after climbing two flights of stairs or carrying a gallon of water.  (*Id.*)  He also described chest tightness from shoveling snow or mowing 400 feet of lawn.  (*Id.*)  He reported tendinitis in his left elbow and grinding in both forearms, both elbows, and the left shoulder.  (Tr. 179.)  Plaintiff also stated that he felt lightheaded upon standing or looking up.  (*Id.*)  On exam, Plaintiff's chest and lungs were clear, his heart had a normal sinus rhythm with no murmurs or gallops.  (Tr. 181.)  Plaintiff had a slightly reduced range of motion in his lumbar spine, but Dr. Wood did not indicate a reduced range of motion in Plaintiff's shoulders or elbows.  (Tr.

---

[2]In Fall 1998, Plaintiff had arthroscopic surgery on his left knee to repair, among other things, a medial meniscus tear.  (Tr. 163.)  By December 1998, Plaintiff reported to his surgeon that his knee was not giving him "any trouble."  (Tr. 160.)  The surgeon noted that Plaintiff had "no pain, no swelling, no locking, [and] no catching."  (*Id.*)

185.) Plaintiff had a slightly reduced range of motion in his left wrist but his right wrist was capable of the normal range of movement.  (Tr. 186.)

In April 2007, a non-physician consultant completed a residual functional capacity assessment of Plaintiff for the State DDS.  (Tr. 187-94.)  The RFC provided that Plaintiff had some postural limitations (e.g., only occasional stair climbing) but could otherwise perform light work, including unlimited ability to push or pull with the upper extremities.  (Tr. 188-89.)  The non-physician consultant did not consider Dr. Browne's March 2007 functional evaluation of Plaintiff.  (*See* Tr. 193.)

After the March 2007 visit, Plaintiff next saw Dr. Browne over a year later, in May 2008.  (Tr. 216.)  Plaintiff reported feeling "decent" but complained of intermittent elbow and shoulder pain.  (Tr. 216.)  Dr. Browne remarked, "[a]lthough [patient] described [his shoulder and elbow pain] as debilitating[,] [he] defers referral to [an orthopedist or for physical therapy] at this time."  (Tr. 216.)

On July 1, 2008, Plaintiff returned to Dr. Browne regarding his recommendation to start insulin.  (Tr. 219.)  Plaintiff, who reported changing his diet, apparently indicated that he wanted to continue without insulin.  (*Id.*)  Plaintiff also reported  pain in his right shoulder and a tremor in his left hand but Dr. Browne did not observe any tremor during the exam.  (*Id.*)  Dr. Browne noted "[questionable] tremor" and that Plaintiff deferred a neurological consult for this condition.  (*Id.*)  Plaintiff also deferred "further evaluation at this time" for his musculoskeletal complaints, including his right-shoulder pain.  (*Id.*)

Later in July 2008, Dr. Browne completed a second functional evaluation of Plaintiff.  (Tr. 195-202.)  In the diagnosis section of the form, Dr. Browne provided "see previous form, now also

6

with pain of elbows [and] shoulders limiting use of arms.  Also [complains of] episode of tremor."
(Tr. 195.)  In a section of the form requesting clinical findings, Dr. Browne provided that Plaintiff's
diabetic control was worsening, Plaintiff had "progressive" shortness of breath, and had progressive
shoulder and elbow pain with a decreased range of motion.  (Tr. 195.)  He estimated that Plaintiff
was experiencing pain and fatigue at the 8-out-of-10 level.  (Tr. 197.)  In the portion of the form
requesting laboratory and diagnostic test results, Dr. Browne noted "HgA1C 9.2."  (Tr. 196.)  Unlike
the March 2007 assessment, Dr. Browne provided that Plaintiff could sit for four hours and stand
or walk for four hours in an eight-hour day.  (Tr. 197.)  He also provided that Plaintiff was now more
limited in lifting and carrying: Plaintiff could at most occasionally lift or carry 5 pounds.  (Tr. 198.)
Dr. Browne further stated that Plaintiff was "essentially precluded" from grasping, turning, and
twisting objects, fine manipulations, and reaching overhead.  (Tr. 199.)  He indicated that Plaintiff's
pain or fatigue would prevent concentration "frequently" – the second most limiting designation.
(Tr. 200.)

On September 25, 2008, Plaintiff returned to Dr. Browne reporting multiple days of
lightheadedness upon standing and an episode of chest pain.  (Tr. 221.)  Later in September 2008,
Plaintiff underwent another exercise stress test.  (Tr. 228.)  The interpreting physician indicated that
Plaintiff had "chest pain with stress" but that there was "no significant change" from the prior July
2006 study.  (Tr. 228.)

In February 2009, Plaintiff saw Dr. Mark Bernstein regarding chest pain.  (Tr. 229-32.)
Plaintiff reported having two episodes of sharp chest discomfort lasting between a half and one
minute.  (Tr. 231.)  He told Dr. Bernstein that he was able to climb stairs without stopping, however,
and that he had only mild shortness of breath with more extreme exertion.  (Tr. 231.)  He also

7

reported mild lightheadedness from rising quickly or tilting his head in certain positions. (Tr. 231.) Dr. Bernstein noted that Plaintiff's "chest discomfort [was] very atypical" and scheduled Plaintiff for carotid duplex scanning. (Tr. 231.)

On March 13, 2009, Plaintiff, on referral from Dr. Bernstein, saw Dr. William Oppat, a vascular surgeon. (Tr. 242-43.) Dr. Oppat explained: "[the] results of the duplex examination . . . demonstrate significant stenosis within the carotid arteries bilaterally. . . . [A confirmatory] test has demonstrated approximately 90% blockage in both the right and left internal carotid arteries." (Tr. 243; *see also* Tr. 235.) Dr. Oppat's plan was to first repair the right internal carotid artery, and if that procedural when well, the left artery. (*Id.*) On March 17, 2009, Plaintiff saw Dr. Browne for a pre-surgical evaluation. (Tr. 250.) Dr. Browne noted that Plaintiff was "medically optimized for surgery." (*Id.*) Plaintiff underwent a "successful right carotid endarterectomy" on March 19, 2009. (Tr. 241, 244-45.)

On March 23, 2009, Dr. Browne wrote a "to whom it may concern" letter regarding Plaintiff's medical condition. (Tr. 238.) He provided:

> James Lang is a long term patient of this office whom I assumed care of January 2007. He suffers from multiple medical problems including: diabetes; atherosclerotic heart disease with a history of myocardial infarction and coronary artery stents; carotid artery stenosis currently requiring endarterectomies; hyperlipidemia; hypertension; bilateral shoulder pain and bilateral elbow pain.
>
> Please see multiple prior forms completed for [Plaintiff's law firm] in the past in regards to his symptoms and limitations and inability to work an 8 hour day.

(*Id.*)

On March 27, 2009, Plaintiff returned to Dr. Oppat for a post-surgery follow-up exam. (Tr.

241.)[3]  Plaintiff denied any syncopal spells, unusual headaches, or speech disturbances.  (*Id.*)  Dr.

Oppat remarked "[s]urprisingly he has had minimal pain and is feeling well overall."  (*Id.*)  Plaintiff

was "anxious to move forward as he ha[d] significant stenosis involving the left carotid artery."

(*Id.*)

On April 6, 2009, Plaintiff returned to Dr. Browne for his left-carotid-artery-pre-surgery

exam.  (Tr. 251.)  Dr. Browne provided that Plaintiff was "feeling well" with "no new symptoms"

and "no chest pains."  (Tr. 251.)  On April 14, 2009, Plaintiff underwent a left carotid artery

endarterectomy.  (Tr. 254.)  On May 8, 2009, he saw Dr. Oppat for a followup and reported no major

issues and denied unusual headaches or symptoms of stroke.  (Tr. 254.)

On July 24, 2009 (three days after his hearing before the ALJ) Plaintiff returned to Dr.

Browne with complaints of right and left shoulder pain and left elbow pain.  (Tr. 269.)  Dr. Browne

diagnosed severe chronic right shoulder pain and left elbow pain.  (*Id.*)  Regarding the right arm, Dr.

Browne noted that Plaintiff was unable to lift paint cans or any weight without pain, and, regarding

---

[3]According to the Mayo Clinic website,

> Carotid endarterectomy is a procedure to treat carotid artery disease,
> a condition that occurs when fatty, waxy deposits build up in one of
> the arteries located on each side of your neck (carotid arteries).  This
> buildup of plaques (atherosclerosis) may restrict blood flow to your
> brain.  Removing plaques causing the narrowing in the artery can
> improve blood flow in your carotid arteries and reduce your risk of
> stroke.

> In carotid endarterectomy, you receive local or general anesthetic.
> Your surgeon makes an incision along the front of your neck, opens
> your carotid artery and removes the plaques that are clogging your
> artery.  Your surgeon then repairs the artery with stitches or a patch
> made with a vein or artificial material (patch graft).

Mayo Clinic Website, *Carotid Endarterectomy*, http://www.mayoclinic.org/carotid- endarterectomy/
(last visited Mar. 19, 2012).

the left arm, he remarked that the elbow pain intermittently affected Plaintiff's ability to write. (*Id.*)

In August 2009, Plaintiff, because of insurance reasons, began seeing a new primary-care physician. (Tr. 271.) Dr. David Yanga noted that Plaintiff reported marked pain in the right shoulder and left forearm with more limited pain in the left shoulder and the right forearm. (Tr. 271.) Upon exam, Dr. Yanga found "no pain over the right shoulder in the subacromial bursa, AC joint or clavicle. There is a full range of motion for both the right and left shoulders." (*Id.*) He did note that Plaintiff had pain on palpitation over the biceps tendon and pain in the right arm with palpitation over some of the extensor muscles. (*Id.*) He also found "popping of the radial head with pronation and supination of the forearm." (*Id.*) His diagnosis was right shoulder biceps tendinitis without clear evidence of a rotator cuff injury and persistent radial head popping/dislocation with supination and pronation. (*Id.*) He recommended that Plaintiff be evaluated by a orthopedic surgeon. (*Id.*)[4]

### 3. Vocational Expert's Testimony

At Plaintiff's administrative hearing, the ALJ asked the Vocational Expert ("VE") to consider someone with Plaintiff's transferable job skills (e.g., report writing) who had the functional

---

[4]The administrative record contains medical evidence from after Dr. Yanga's exam, but this evidence post-dates the ALJ's decision. Because the Appeals Council denied Plaintiff's request for review, these exhibits are not proper for the Court to consider in deciding whether to affirm or reverse the ALJ's decision pursuant to sentence four. *See Davenport v. Comm'r of Soc. Sec.*, No. 10-13842, 2012 WL 414821, at *1 n.1 (Jan. 19, 2012) *report adopted by* 2012 WL 401015 (E.D. Mich. Feb. 8, 2012) ("In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision . . . those 'AC' exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review." (citing *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993); *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996))).

capacity to perform light work[5] except no "climbing of ladders, ropes, or scaffolds," only occasional climbing of ramps and stairs, and only "occasional balancing, stooping, kneeling, crouching, crawling, or squatting." (Tr. 55.) The VE testified that such an individual could perform Plaintiff's past work as a chemical technician in the fashion that the job is typically performed (as opposed to Plaintiff's job-specific requirements). (Tr. 53, 55-56.) The VE also provided that such an individual could work in a number of sedentary exertion[6] but skilled occupations: biological technician (62 jobs in Michigan), agricultural and food science technician (61 jobs), material scientist (606 jobs), and medical technician (1,605 jobs). (Tr. 53-54.) At the light exertion and skilled level, the hypothetical individual could work as a medical technician (6,200 jobs available in Michigan's lower peninsula), food and dye maker (1,475 jobs), and machine operator (21,950 jobs). (Tr. 54-55.)

The ALJ then restricted the hypothetical individual further. He added the limitations of "frequent . . . reaching, pushing or pulling with the left upper extremity" and "[n]o reaching above shoulder level with the right upper extremity." (Tr. 56.) The VE testified that while she "would have to look [the jobs] up," she believed that the more restricted individual could still perform the light exertional positions. (Tr. 57.) However, the VE testified that if the hypothetical individual was

_____

[5]*See* S.S.R. 83-10, 1983 WL 31251, at *5 ("The regulations define light work as lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. . . . Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday.").

[6]*See* S.S.R. 83-10, 1983 WL 31251, at *5 ("The regulations define sedentary work as involving lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools . . . . Since being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday").

further restricted to only occasional reaching, pushing, and pulling with the dominant extremity, the individual would not be able to perform Plaintiff's past work or the other jobs she had cited.  (Tr. 57.)

### C.  Framework for Disability Determinations

Under the Social Security Act (the "Act") Disability Insurance Benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) is available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age,

education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The Administrative Law Judge's Findings

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 16, 2005 – Plaintiff's alleged disability onset date. (Tr. 19.) At step two, he found that Plaintiff had the following severe impairments: tendinitis of the left knee, coronary artery disease, diabetes, hypertension, and arthritis of the right shoulder. (Tr. 18.) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 18.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to lift or carry 20 pounds occasionally and 10 pounds frequently, stand, walk, or sit at least six hours in an eight-hour work day, perform frequent, but not constant, pushing, pulling, or reaching with the left arm, and occasionally climb ramps or stairs, stoop, crouch, kneel, crawl, balance, or squat, but did not have the capacity to reach above shoulder level with the right arm or climb ladders, scaffolds, or ropes. (Tr. 18.) At step four, the ALJ found that Plaintiff could perform his past relevant work (as the job is typically performed). (Tr. 24.) Proceeding in the alternative, at step five, the ALJ relied on VE testimony in response to his hypothetical, and found that Plaintiff could perform a number of sedentary-skilled and light-skilled occupations. (Tr. 25.)

13

### E.  Standard of Review

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." (internal quotation marks omitted)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole.  *Bass*, 499 F.3d

at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." (internal quotation marks omitted)). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

### F.  Analysis

Plaintiff argues that the ALJ committed reversible error in three ways. First, says Plaintiff, the ALJ failed to follow the treating physician rule in evaluating Dr. Browne's opinions. (Pl.'s Mot. Summ. J. at 8-11.) Next, Plaintiff argues that the ALJ erred in weighing his credibility. (*Id.* at 11-14.) Third, Plaintiff claims that the ALJ relied on VE testimony given in response to hypotheticals that do not accurately portray Plaintiff's residual functional capacity. (*Id.* at 14.) The Court considers these claims of error in turn.

#### 1.  The ALJ Violated the Explanatory Requirement of the Treating-Physician Rule in Evaluating Dr. Browne's Opinions

Plaintiff argues that the ALJ failed to correctly apply the treating-source rule in weighing the opinions of his primary-care physician, Dr. Browne. (Pl.'s Mot. Summ. J. at 9.) In particular, says Plaintiff, Dr. Browne's opinions are consistent with disability, are based on "clinical and objective evidence," and are "uncontradicted by other substantial evidence in the case record." (*Id.*) While

15

the Court finds that the ALJ reasonably gave Dr. Browne's opinions less than controlling weight (and gave an adequate explanation for doing so), the Court agrees with Plaintiff that the ALJ provided an inadequate explanation for rejecting Dr. Browne's opinions altogether.

Under the treating source rule, an ALJ must generally give greater deference to the opinions of treating physicians than to those of non-treating physicians. *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010); *see also* 20 C.F.R. § 404.1527; S.S.R. 96-2p, 1996 WL 374188. The rationale behind this rule is straightforward:

> treating sources . . . are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).

Treating-source analysis proceeds in two steps. First, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)). Second, where the ALJ finds that a treating physician's opinion is not entitled to controlling weight, he must apply the following non-exhaustive list of factors to determine how much weight to give the opinion: (1) "the length of the treatment relationship and the frequency of examination," (2) "the nature and extent of the treatment relationship," (3) the relevant evidence presented by a treating physician to support his opinion, (4) "consistency of the opinion with the record as a whole," and (5) "the specialization of the treating source." *Id.*; 20 C.F.R. § 404.1527. In addition, as will be discussed in greater detail below, the

16

treating-source rule contains an explanatory requirement that an ALJ give "good reasons" for the weight he gives a treating-source opinion. *See e.g.*, *Wilson*, 378 F.3d at 544; *Rogers*, 486 F.3d at 243.

Turning to the first step of the analysis, the ALJ gave good reasons for giving Dr. Browne's opinions less than controlling weight. In this regard, the ALJ explained,

> The undersigned does not assign controlling weight to the opinions of treating physician Dr. Browne dated March 13, 2007 (Exhibit 4F) and July 21, 2008 (Exhibit 7F) that the claimant is limited to a less than sedentary range of work that includes work-preclusive limitations, as these assessments are not fully supported by the medical record, including Dr. Browne's own treatment records.

(Tr. 23.) The ALJ also similarly reasoned, "Dr. Browne apparently relied quite heavily on the subjective report of symptoms and limitations provided by the claimant when she [*sic*] completed the questionnaires in 2007 and 2008." (*Id.*) Substantial evidence supports these conclusions.

None of Dr. Browne's office notes prior to March 13, 2007 mention shortness of breath on activity, lightheadedness when standing, or left elbow pain. Each of these symptoms appear for the first time in notes from March 13, 2007. Yet, in the section of the form soliciting Plaintiff's "primary symptoms," Dr. Browne provided shortness of breath, lightheadedness, left elbow pain, and knee pain. (Tr. 173.) The omission of these symptoms in Dr. Browne's pre-March 2007 notes, combined with his questioning of Plaintiff's symptoms in response to Plaintiff's counsel's letter, strongly supports the ALJ's inference: that Dr. Browne's March 13, 2007 functional evaluation was based primarily on Plaintiff's self reporting. This inference is further strengthened by the fact that, as the ALJ recognized, Dr. Browne did not support his findings with reference to medical evidence or his treatment notes. In the portion of the form requesting "laboratory and diagnostic test results which demonstrate and/or support your diagnosis," Dr. Browne provided: "HgA1C 8.9 – [p]oorly

[c]ontrolled [diabetes]." (Tr. 173.) It is entirely unclear how this test result – or even Dr. Browne's diagnoses (coronary artery disease, poorly controlled diabetes mellitus, and left knee surgeries in 1970 and 1998) – support his conclusion that Plaintiff could sit for only two hours in an eight-hour day or could lift or carry a maximum of 10 pounds.

Turning to Dr. Browne's July 2008 functional assessment, Dr. Browne provided that Plaintiff had pain and fatigue at the 8-out-of-10 level, could at most occasionally lift or carry 5 pounds, and was "essentially precluded" (the most severe selection available) from grasping, turning, and twisting objects, fine manipulations, and reaching overhead. But Plaintiff saw Dr. Browne only twice between his March 2007 and July 2008 opinions. At the May 2008 exam, Dr. Browne seemed to question the severity of Plaintiff's functional limitations from his arm pain: "[a]lthough [patient] described [his shoulder and elbow pain] as debilitating[,] [he] defers referral to [orthopedist or physical therapy] at this time." In early July 2008, Plaintiff reported pain in his right shoulder and a tremor in his left hand. On exam, however, Dr. Browne did not observe any tremor. Further, Plaintiff again deferred referrals to medical specialists. Absent from Dr. Browne's treatment records are any objective testing (such as x-rays or EMGs) or examination findings (such as range of motion or grip-strength, arm-strength, or manipulative testing) supporting severe upper-extremity limitations (such as lifting at most 5 pounds occasionally). Indeed, Dr. Browne did not even diagnose Plaintiff's upper-extremity pain.

Finally, in March 2009, Dr. Browne wrote a "to whom it may concern" letter regarding Plaintiff's functional limitations. He listed Plaintiff's diagnosis and conditions and noted that Plaintiff's carotid artery stenosis required surgery and that Plaintiff had "bilateral shoulder pain and bilateral elbow pain." Dr. Browne then stated, "Please see multiple prior forms completed for

18

[Plaintiff's law firm] in the past in regards to his symptoms and limitations and inability to work an 8 hour day."

The ALJ did not explicitly state whether he considered the March 2009 letter an "opinion." Nonetheless, the ALJ was clearly cognizant of the letter and in fact thoroughly summarized its contents in his narrative.  (Tr. 21.)  And the Court finds that the reasons the ALJ provided for rejecting the March 2007 and July 2008 opinions also apply to Dr. Browne's March 2009 opinion. For instance, Dr. Browne's notes from exams between July 2008 and March 2009 make no mention of Plaintiff's upper-extremity pain or any testing or evaluation of Plaintiff's upper extremities.

Although the ALJ reasonably gave less than controlling weight to Dr. Browne's opinions, that does not end the treating-source inquiry.  In particular, Dr. Browne's opinions were still entitled to "great deference" unless the ALJ provided an adequate explanation, supported by substantial evidence, for rejecting them altogether.  *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) ("Even if the treating physician's opinion is not given controlling weight, 'there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference.'" (quoting *Rogers*, 486 F.3d at 242)); *see also* S.S.R. 96-2p, 1996 WL 374188, at *4 ("Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected.").

Plaintiff correctly points out that the ALJ never assigned a specific weight to Dr. Browne's opinions.  And although the Commissioner persuasively argues that it can be inferred that the ALJ completely rejected Dr. Browne's opinions, it remains that the ALJ never discussed the vast majority

19

of the 20 C.F.R. § 404.1527(d) factors in making this implicit rejection. The Sixth Circuit has urged

courts to proceed with caution in this scenario. In *Blakely v. Comm'r of Soc. Sec.* our Court of

Appeals stated:

> Even assuming *arguendo* that the ALJ correctly reached her
> determination that [the treating source] should be discredited, the
> ALJ's summary rejection of [the treating-source] without explaining
> the weight given his opinions falls short of the Agency's own
> procedural requirements: "[A] finding that a treating source medical
> opinion . . . is inconsistent with the other substantial evidence in the
> case record means only that the opinion is not entitled to 'controlling
> weight,' not that the opinion should be rejected." Soc. Sec. Rul.
> 96-2p, 1996 WL 374188, at *4. "Treating source medical opinions
> are still entitled to deference and must be weighed using all of the
> factors provided in 20 C.F.R. § 404.1527 and 416.927." *Id.*

581 F.3d 399, 408 (6th Cir. 2009). And more recently, the Sixth Circuit reiterated:

> After accepting [the treating-source's] diagnosis, the ALJ then
> rejected the conclusions contained in her RFC assessment about the
> severity of [the claimant's] impairments as they relate to work.
> Before doing so, the ALJ failed to conduct the balancing of factors to
> determine what weight should be accorded these treating source
> opinions, and the Commissioner conceded at oral argument that the
> ALJ did not assign a specific weight to [the treating source's] RFC
> assessment. This alone constitutes error.

*Cole v. Astrue*, 661 F.3d 931, 938 (6th Cir. 2011) (citing *Blakely*, 581 F.3d at 408.)

On the other hand, the Court is not aware of any authority providing that an ALJ must always

explicitly *discuss* each of the 20 C.F.R. § 404.1527(d) factors in his narrative. Indeed, there is

persuasive authority to the contrary. *Klimas v. Comm'r of Soc. Sec.*, No. 1:10-cv-666, 2012 WL

691702, at *1 (W.D. Mich. Mar. 1, 2012); *Paseka v. Comm'r of Soc. Sec.*, No. 1:09-CV-1073, 2011

WL 883701, at *1-2 (W.D. Mich. Mar. 11, 2011). But in this case, without further explanation from

the ALJ, the Court cannot tell whether the ALJ even *considered* the factors in rejecting Dr.

Browne's opinions. The Court is particularly troubled by the fact that one of the undiscussed factors

is the "consistency of the opinion with the record as a whole." *See* 20 C.F.R. § 404.1527(d). Plaintiff has correctly argued that Dr. Browne was the only medical professional to provide a residual functional capacity assessment. On behalf of the State DDS, a *non-physician* consultant reviewed Plaintiff's file (and even then did not review Dr. Browne's March 2007 assessment). The ALJ pointed to no medical record other than this lay opinion that contradicted Dr. Browne's opinions. While Dr. Browne's opinions were unsupported, and therefore not entitled to controlling weight, they were essentially uncontradicted. *Cf. Hensley*, 573 F.3d at 267 ("Nothing in the regulations indicates, or even suggests, that the administrative judge may decline to give the treating physician's medical opinion less than controlling weight simply because another physician has reached a contrary conclusion."). Thus the ALJ was left to balance the unsupported, but repeated opinions of a long-time treating physician, the medical evidence in the file, and a non-physician opinion. With those items on the scale, the ALJ flatly concluded that the lay "assessment appears consistent with the medical evidence, and is given significant weight." It does not appear that the ALJ ever considered whether Dr. Browne's opinions might also have been "consistent with the medical evidence." But this is what Sixth Circuit case law requires. *See Blakely*, 581 F.3d at 408; *Cole*, 661 F.3d at 938.

The Court is aware that remand in this case may be unlikely to provide Plaintiff with the relief he seeks. But that fact does not excuse the ALJ's failure to comply the explanatory requirement of the treating-physician rule. *Wilson*, 378 F.3d at 546 ("A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely."). Moreover, Sixth Circuit case law counsels that the

Court should not hesitate to remand where the ALJ has failed to give the requisite "good reasons" for rejecting a treating-source opinion. *Sawdy v. Comm'r of Soc. Sec.*, 436 F. App'x 551, 553 (6th Cir. 2011) (noting that the course of action for failure to comply with the "good reasons" requirement is now "well charted" in the Sixth Circuit: "when an ALJ violates the treating-source rule, '[w]e do not hesitate to remand,' and 'we will continue remanding when we encounter opinions from ALJ[s] that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.'" (quoting *Hensley*, 573 F.3d at 267)); *Rogers*, 486 F.3d at 243 ("[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.").

Accordingly, the Court finds that this case should be remanded for the ALJ to explicitly state what weight he gave Dr. Browne's opinions and the reasons for that weight, including, whether Dr. Browne's opinions are inconsistent with the record evidence.

### 2. The ALJ Reasonably Discounted Plaintiff's Credibility

Plaintiff next argues that the ALJ erred in discounting his credibility. (Pl.'s Mot. Summ. J. at 11-12.) This Court disagrees.

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Calvin v. Comm'r of Soc. Sec.*, 437 F. App'x 370, 371 (6th Cir. 2011) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997)). In making a credibility determination, "the ALJ must determine whether a claimant has a medically determinable physical

or mental impairment that can reasonably be expected to produce the symptoms alleged." *Id.* If the claimant has such an impairment, the ALJ must then consider a non-exhaustive list of factors in evaluating "the intensity, persistence, and functional limitations of those symptoms": (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant received for relief of pain or other symptoms; (6) any measures the claimant used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); *Calvin*, 437 F. App'x at 370.

Similar to the treating-source rule, an explanatory requirement accompanies the credibility assessment standards. An ALJ's "decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." S.S.R. 96-7p, 1996 WL 374186 at *2. However, an ALJ need not explicitly discuss each 20 C.F.R. § 404.1529(c)(3) factor in his narrative. *McCoy v. Astrue*, No. 09-11897, 2010 WL 3766473, at *6 (E.D. Mich. Sept. 21, 2010); *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005) (citing *Blom v. Barnhart*, 363 F. Supp. 2d 1041, 1054 (E.D. Wisc. 2005)); *see also Bowman v. Chater*, 132 F.3d 32 (table), 1997 WL 764419, at *4 (6th Cir. 1997) ("While this court applied each of [the § 404.1529(c)(3)] factors in [*Felisky v. Bowen*, 35 F.3d 1027, 1039-1040 (6th Cir. 1994)] we did not mandate that the ALJ undergo such an extensive analysis in every decision. Rather, we held that where the medical record

23

does not contain objective evidence to support pain allegations, such allegations may not be dismissed without a review of non-medical factors.").

Here, the ALJ discounted Plaintiff's credibility for two main reasons.  First, the ALJ reasoned that "[t]he claimant received very little medical treatment for any of his impairments since the alleged onset date.  The record reveals relatively infrequent trips to his primary care physician for the allegedly disabling symptoms."  (Tr. 23.)  The ALJ also concluded that "[t]he claimant has described daily activities that are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations."  (Tr. 23.)  These reasons are supported by substantial evidence and are adequate to explain to Plaintiff why his testimony was not wholly credited.

Plaintiff did, as the ALJ stated, decline more extensive medical treatment for his conditions and his treatment with Dr. Browne was fairly limited.  Plaintiff's alleged disability onset date is September 16, 2005.  But Plaintiff did not see Dr. Browne until May 2006, when Dr. Browne noted he had not seen Plaintiff in over two years.  Then, from May 2006 through the end of 2008 (a two-and-a-half year period) Plaintiff was examined by Dr. Browne less than ten times.  Indeed, Dr. Browne did not see Plaintiff at all between March 2007 and May 2008.  As the ALJ noted, Plaintiff also declined Dr. Browne's referrals to specialists for his arm problems and declined Dr. Browne's recommendation to start insulin for his diabetes.  It is true that in 2009 Plaintiff had extensive treatment, including surgery, for chest discomfort.  However, it does not appear that Plaintiff offered any testimony related to his heart condition (or hypertension) that the ALJ discredited.  Plaintiff testified to getting dizzy upon standing.  (Tr. 41.)  But Plaintiff clarified that he does not have a problem being on his feet after he stands up.  (Tr. 44.)  In fact, in a self-completed function report, Plaintiff indicated he could walk 1000 feet before needing a 10-minute rest.  (Tr. 143.)  Plaintiff also

testified to shortness of breath after climbing stairs. But on his self-completed function report, he did not indicate any problem climbing stairs (Tr. 143), and, in any event, the ALJ limited Plaintiff to only occasional stair or ramp climbing (Tr. 18).

The ALJ also reasonably relied on Plaintiff's activities of daily living to discount Plaintiff's credibility. Plaintiff testified that he cleans his house, including mopping, sweeping, and vacuuming, that he does laundry, and goes grocery shopping. He also testified that he took a single-day car trip as a passenger from Michigan to New York (a more than ten-hour drive) without any issues other than boredom. In his self-completed function report, he indicated that he goes for coffee or to the library three times a week.[7] The Court recognizes that the ability to perform these tasks does not equate with the ability to work on a full-time basis. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248-49 (6th Cir. 2007). However, this does not mean that activities of daily living are irrelevant to the credibility determination or that the ALJ erred in relying on Plaintiff's ability to perform them. *See* 20 C.F.R. § 404.1529(c)(3); S.S.R. 96-7p, 1996 WL 374186, at *3.

Additionally, it is not clear how any of Plaintiff's allegations are inconsistent with the requirements of the jobs identified by the VE. Prior to questioning the VE, Plaintiff testified to lightheadedness on rising (Tr. 40), shortness of breath (Tr. 41), tendinitis affecting writing (Tr. 39, 49-50), diabetes, high cholesterol, high blood pressure (Tr. 42), and pain on right-arm raising more than 45 degrees (Tr. 44). When the ALJ asked the VE to fully credit Plaintiff's testimony (which

---

[7]Plaintiff takes issue with the ALJ's inference from his testimony that it took him four hours to mow his lawn using a riding mower. (Pl.'s Mot. Summ. J. at 13.) But the Court notes that Plaintiff did not testify that this task took an inordinate amount of time because he needed frequent breaks – only that he split the task over two days. This is a relatively minor point, and the Court does not view the ALJ's error in this regard, if any, to warrant remand for a new credibility determination.

includes the statements just cited), the VE testified that Plaintiff's allegations would *not* preclude the light and sedentary jobs she identified. (Tr. 58.) When Plaintiff subsequently testified that he had pain when lifting heavy items from the floor to the bench at his prior job (Tr. 60), the VE provided an indirect response: she said that if Plaintiff were unable to carry, handle, or lift things at a "frequent level" he would be precluded from the jobs she identified (Tr. 61). Notably then, is the absence of testimony from Plaintiff that the pain-causing floor-to-bench lifting was at the "frequent level" or at the relatively low weight demanded by light (or sedentary) work. In fact, Plaintiff's self-completed work history report and testimony suggest that the weight that caused Plaintiff's pain was much higher than that contemplated by sedentary or light work. (*See* Tr. 37-38 (testifying that job required lifting raw materials weighing 60 to 80 pounds); Tr. 131 (indicating on work history report that job involved "lifting raw materials to lab bench. . . . Raw material ranged from quart to 5 [gallon] pail."). Additionally, the VE never suggested, and Plaintiff has not evidenced to this Court, that any of the cited jobs required the specific task of lifting heavy items from the floor to a bench. In fact, the VE testified that Plaintiff's prior job, as Plaintiff described it, was classified at the heavy exertional level. (Tr. 53.)

Accordingly, the Court finds that the ALJ did not err in assessing Plaintiff's credibility, or, if the ALJ did err, that the ALJ's error was harmless.

### 3. *Plaintiff's Inaccurate-Hypothetical Claim is Derivative*

At step five of the five-step disability determination, the ALJ relied on VE testimony in response to several hypotheticals. Plaintiff argues that the ALJ's reliance is misplaced because the hypotheticals did not accurately reflect what he can and cannot do. This argument, however, is premised on the claim that the ALJ erred in evaluating Dr. Browne's opinions or erred in

26

discounting Plaintiff's credibility. (*See* Pl.'s Mot. Summ. J. at 14.) Because the Court has recommended remand for the ALJ to more adequately address Dr. Browne's opinions, should this reexamination cause the ALJ to reassess Plaintiff's RFC, the Court expects that the ALJ will solicit additional VE testimony. Further analysis of this claim of error is therefore unnecessary.

### G. Conclusion

For the foregoing reasons, this Court finds that the ALJ did not comply with the procedural aspects of the treating-source rule in rejecting the opinions of Plaintiff's long-time primary-care physician. Accordingly, this Court RECOMMENDS that Plaintiff's Motion for Summary Judgment be GRANTED IN PART, that Defendant's Motion for Summary Judgment be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## III. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon

27

this magistrate judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2).  Once an

objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be

filed within seven (7) days of service of the response.  E.D. Mich. LR 72.1(d)(3), (4).



s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  March 29, 2012


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or
parties of record by electronic means or U.S. Mail on March 29, 2012.


s/Jane Johnson
Deputy Clerk